# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

KAREN SELENA ROSARIO URENA, :   CIVIL NO.: 1:24-cv-02178
O/B/O K.N.M.R. (a minor),         :

              :

        Plaintiff,         :   (Magistrate Judge Schwab)

              :

        v.             :

              :

              :

FRANK BISIGNANO,[1]         :
Commissioner of Social Security,    :

              :

        Defendant.       :

## <u>MEMORANDUM OPINION</u>

## I. Introduction.

In this social security action, Plaintiff Karen Selena Rosario Urena ("Urena") seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for supplemental security income benefits under Title XVI of the Social Security Act on behalf of K.N.M.R., her minor child. We have jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). For

---

[1] Frank Bisignano is now the Commissioner of Social Security, and he is automatically substituted as the defendant in this action. *See* Fed. R. Civ. P. 25(d) (providing that when a public officer sued in his or her official capacity ceases to hold office while the action is pending, "[t]he officer's successor is automatically substituted as a party"); 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

the reasons set forth below, we will vacate the Commissioner's decision and remand the case to the Commissioner for further proceedings.

## II. Background and Procedural History.

We refer to the transcript provided by the Commissioner. *See docs. 12-1* to *12-7.*[2]   On October 5, 2022, Urena protectively filed[3] an application for supplemental security income benefits on behalf of her minor child K.N.M.R., alleging that K.N.M.R. has been disabled since November 1, 2021. *Admin. Tr.* at 173–97.  After the Commissioner administratively denied her claim, *id.* at 60–72, Urena requested an administrative hearing, *id.* at 90–91.  On January 24, 2024, Urena—who was represented by a non-attorney representative—testified with the assistance of an interpreter at a hearing before Administrative Law Judge Howard Kauffman (the "ALJ"). *Id.* at 45–59.  On March 14, 2024, the ALJ denied Urena's claim for benefits. *Id.* at 22–44.

---

[2] Because the facts of this case are well known to the parties, we do not repeat them here in detail.  Instead, we recite only those facts that bear on Urena's claim.

[3] "Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits." *Stitzel v. Berryhill*, No. 3:16-CV-0391, 2017 WL 5559918, at *1 n.3 (M.D. Pa. Nov. 9, 2017).  "A protective filing date allows an individual to have an earlier application date than the date the application is actually signed." *Id.*

Urena appealed the ALJ's decision to the Appeals Council, which denied her request for review. *Id*. at 1–9. This makes the ALJ's decision the final decision of the Commissioner subject to judicial review by this Court.

In December 2024, Urena, now represented by counsel, began this action by filing a complaint seeking review of the Commissioner's decision denying her claim. *See Doc. 1*. She requests that the court reverse the Commissioner's decision and award her benefits or, in the alternative, remand the case for further proceedings. *Id*. at 2 (Wherefore Clause). She also seeks attorney's fees and "such other and further relief" as the court deems just. *Id*.

The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c), and the case was referred to the undersigned. *Doc. 10*. The Commissioner then filed an answer and a certified transcript of the administrative proceedings. *Docs. 11, 12*. The parties filed briefs, *see docs. 17–19*, and this matter is ripe for decision.

## III.  Legal Standards.

### A. Substantial Evidence Review—the Role of This Court.

When reviewing the Commissioner's final decision denying a claimant's application for benefits, "the court has plenary review of all legal issues decided by the Commissioner." *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012).

3

But the court's review of the Commissioner's factual findings is limited to whether substantial evidence supports those findings. *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 587 U.S. 97, 99 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek*, 587 U.S. at 103. Substantial evidence "means— and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

Substantial evidence "is less than a preponderance of the evidence but more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's] finding from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F.Supp.2d 623, 627 (M.D. Pa. 2003).

The question before this court, therefore, is not whether K.N.M.R. is disabled, but whether substantial evidence supports the Commissioner's finding that K.N.M.R. is not disabled and whether the Commissioner correctly applied the relevant law.

**B. Child Disability Standards.**

To receive supplemental security income pursuant to Title XVI of the Social Security Act, a claimant under the age of 18 ("child") must demonstrate that he or she has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i); *see also* 20 C.F.R. § 416.906. The ALJ follows a three-step sequential-evaluation process to determine whether a child claimant is disabled. *See* 20 C.F.R. § 416.924.  Under this process, the ALJ must sequentially determine: (1) whether the child is engaged in substantial gainful activity; (2) if not, whether the child has an impairment or combination of impairments that is severe; and (3) if so, whether the child's severe impairment (or combination of impairments) meets, medically equals, or functionally equals one of the disability listings. *Id.*

5

At step three, an impairment meets or medically equals a listed impairment if the impairment (or combination of impairments) and its symptoms are equal in severity and duration to the criteria of any listed impairment. *Id.* § 416.926(a); *see also Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). If a child's impairment, or combination of impairments, does not meet or medically equal a listing, the ALJ will decide whether the impairment results in limitations that are functionally equivalent to a listed impairment. 20 C.F.R. § 416.926a(a). Whether a child's impairment functionally equals a disability listing is analyzed in terms of six functional domains. *Id.* § 416.926a(b). "These domains are broad areas of functioning intended to capture all of what a child can or cannot do." *Id.* § 416.926a(b)(1). The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical wellbeing. *Id.* When determining whether an impairment is functionally equivalent to a listing, the ALJ considers the effects of all the child's impairments, including those impairments that the ALJ does not identify as severe at step two of the analysis. *Id.* § 416.926a(a).

An impairment is functionally equivalent to a disability listing if it results in a "marked" limitation in two domains or an "extreme" limitation in one domain. *Id.* A "marked" limitation is one that seriously interferes with the child's "ability

6

to independently initiate, sustain, or complete activities." *Id.* § 416.926a(e)(2)(i). A "'[m]arked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.'" *Id.*  An "extreme" limitation is one that very seriously interferes with the child's "ability to independently initiate, sustain, or complete activities." *Id.* § 416.926a(e)(3)(i).  An "'[e]xtreme' limitation also means a limitation that is 'more than marked.'" *Id.*

The ALJ uses a "whole child" approach in determining whether an impairment is functionally equivalent to a listing. Soc. Sec. Ruling 09-1p, *Title XVI: Determining Childhood Disability Under the Functional Equivalence Rule— the "Whole Child" Approach*, 2009 WL 396031 (Feb. 17, 2009).  Under this approach, the ALJ begins "by considering the child's functioning without considering the domains or individual impairments." *Id.* at *1.  After identifying "which of a child's activities are limited," the ALJ then determines "which domains are involved in those activities," and "whether the child's impairment(s) could affect those domains and account for the limitations." *Id.* at *2.  An impairment "may have effects in more than one domain" and limitations caused by an impairment must be evaluated "in any affected domain(s)." *Id.* (quoting 20 C.F.R. § 416.926a(c)).  Finally, the ALJ "rate[s] the severity of the limitations in each affected domain." *Id.*  "This technique for determining functional equivalence accounts for all of the effects of a child's impairments singly and in combination—

the interactive and cumulative effects of the impairments—because it starts with a consideration of actual functioning in all settings." *Id.*

The ALJ's disability determination must also meet certain basic substantive requisites. Most significantly, the ALJ must provide "a clear and satisfactory explication of the basis on which" his or her decision rests. *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981). "The ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F. 3d 429, 433 (3d Cir. 1999). The "ALJ may not reject pertinent or probative evidence without explanation." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 204 (3d Cir. 2008). Otherwise, "'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Cotter*, 642 F.2d at 705).

## IV. The ALJ's Decision.

The ALJ found that K.N.M.R. was born on May 23, 2018, and he concluded that K.N.M.R. was a preschooler both on October 5, 2022, the date the application

8

was filed, and on March 14, 2024, the date of his decision. *Admin. Tr.* at 29.[4]  He

then proceeded through the three-step sequential-evaluation process.

At step one of the sequential-evaluation process, the ALJ found that

K.N.M.R. had not engaged in substantial gainful activity since October 5, 2022

(the application date). *Id.*  At step two of the sequential-evaluation process, he

found that K.N.M.R. had the following severe impairments: urinary tract infection,

vesicoureteral reflux, and reflux neuropathy secondary to idiopathic constipation.

*Id.*  And at step three of the sequential-evaluation process, he found that K.N.M.R.

does not have an impairment or combination of impairments that meets or

medically equals a listing or that functionally equals the severity of the listings. *Id.*

at 29–30.

With regard to whether K.N.M.R. has an impairment or combination of

impairments that functionally equal the severity of the listings, the ALJ determined

that K.N.M.R. has no limitations in the domains of acquiring and using

information, interacting and relating with others, moving about and manipulating

objects, and caring for oneself. *Id.* at 30, 31, 33–39.  He found that K.N.M.R. has a

less than marked limitation in the domain of attending and completing tasks. *Id.* at

30, 34–35.  And he found that K.N.M.R. has a marked limitation in the domain of

---

[4] For readability purposes, here—and elsewhere—when citing or quoting the ALJ's decision, we omit the ALJ's citations to regulations as well as citations to the record.

health and physical wellbeing. *Id.* at 30, 39–40.  In making these findings, the ALJ considered Urena's contentions and testimony regarding K.N.M.R.'s limitations. *Id*. at 31, 32, 34–39.  But he concluded that although K.N.M.R.'s "medically determinable impairments could reasonably be expected to cause the alleged symptoms[,]" Urena's "allegations concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." *Id*. at 31.  The ALJ also considered K.N.M.R.'s medical records and the medical opinion evidence. *Id*. at 31–40.

In sum, the ALJ concluded that K.N.M.R. has not been disabled since October 5, 2022, the protective filing date. *Admin. Tr.* at 40.  Thus, he denied the claim for supplemental security income. *Id.*

## V.  Discussion.

Urena presents one claim.  She claims that the ALJ's findings regarding whether K.N.M.R.'s impairments functionally equal the listings are not supported by substantial evidence because the case file is missing K.N.M.R.'s school records. In other words, Urena claims that the ALJ erred by failing to develop the record to include K.N.M.R.'s school records.  We agree.

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000).  "[T]he special nature of proceedings for

disability benefits dictates extra care on the part of the agency in developing an administrative record and in explicitly weighing all evidence." *Dobrowolsky v. Califano*, 606 F.2d 403, 406–07 (3d Cir. 1979) (footnote omitted).  The ALJ must play an "active role" in this regard. *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995).  He or she has "a duty to develop a full and fair record[,]" and "must secure relevant information regarding a claimant's entitlement to social security benefits." *Id*.  When the claimant is unrepresented, the ALJ must "assume a more active role[.]" *Dobrowolsky*, 606 F.2d at 407.  Nevertheless, the duty to develop a full and fair record "applies regardless of whether a claimant is pro se or represented because of the non-adversarial nature of Social Security disability benefit proceedings." *West v. Kijakazi*, No. 3:21-CV-01350, 2023 WL 2742746, at \*4 (M.D. Pa. Mar. 31, 2023) (citing *Boone v. Barnhart*, 353 F.3d 203, 208 n.11 (3d Cir. 2003)).

The ALJ's duty to develop the record "does not relieve the claimant of her burden of proof[.]" *Guzman v. Berryhill*, No. 3:17-CV-1222, 2018 WL 746385, at \*8 (M.D. Pa. Feb. 7, 2018) (citing *Hess v. Sec'y of Health, Ed. & Welfare*, 497 F.2d 837, 840 (3d Cir. 1974)).  But "[i]f the record is inadequate for proper evaluation of the evidence, the ALJ's duty to develop the record is triggered." *Id*.  "Ultimately, the question is whether the administrative record has been adequately

11

developed under the circumstances to provide a substantial basis for the decision."
*Id*. (internal quotation marks and citations omitted).

Here, K.N.M.R. was in preschool and then kindergarten during the time period in question.  Yet, as the parties agree, the record does not contain any of K.N.M.R.'s school records.  This despite not only the ALJ's general duty to develop the record, but the fact that the regulations and Social Security Rulings regarding child claims emphasize the importance of such records.

The regulations and Social Security Rulings provide that a child's functioning will be evaluated in all settings, including the school setting. *See, e.g.*, 20 C.F.R. § 416.926a(a)(2) ("When we assess your functional limitations, we will consider all the relevant factors in §§ 416.924a, 416.924b, and 416.929 including, but not limited to . . . How you function in school[.]"); 20 C.F.R. § 416.926a(b) ("How we will consider your functioning.  We will look at the information we have in your case record about how your functioning is affected during all of your activities when we decide whether your impairment or combination of impairments functionally equals the listings.  Your activities are everything you do at home, at school, and in your community. We will look at how appropriately, effectively, and independently you perform your activities compared to the performance of other children your age who do not have impairments."); 20 C.F.R. § 416.926a(b)(2)(iv) ("When we evaluate your ability to function in each domain,

we will ask for and consider information that will help us answer the following questions about whether your impairment(s) affects your functioning and whether your activities are typical of other children your age who do not have impairments [including] . . . Where do you have difficulty with your activities—at home, in childcare, at school, or in the community?"); 20 C.F.R. § 416.924a(b)(7)(v) ("Attendance and participation.  We will also consider factors affecting your ability to participate in your education program.  You may be unable to participate on a regular basis because of the chronic or episodic nature of your impairment(s) or your need for therapy or treatment. . . . We will consider how your temporary removal or absence from the program affects your ability to function compared to other children your age who do not have impairments."); 20 C.F.R. § 416.924a(b)(3)(i) ("Information about what you can and cannot do, and how you function on a day-to-day basis at home, school, and in the community, allows us to compare your activities to the activities of children your age who do not have impairments."); Soc. Sec. Ruling 09-1p, *Title XVI: Determining Childhood Disability Under the Functional Equivalence Rule—the "Whole Child" Approach*, 2009 WL 396031 at *2 (Feb. 17, 2009) ("We always evaluate the "whole child" when we make a finding regarding functional equivalence, unless we can make a fully favorable determination or decision without having to do so.  The functional equivalence rules require us to begin by considering how the child functions every

13

day and in all settings compared to other children the same age who do not have impairments. . . . 'Functioning' refers to a child's activities; that is, everything a child does throughout the day at home, at school, and in the community, such as getting dressed for school, cooperating with caregivers, playing with friends, and doing class assignments. We consider [among other things] . . . Where the child has difficulty with activities—at home, in childcare, at school, or in the community[.]"); Soc. Sec. Ruling 09-8p, *Title XVI: Determining Childhood Disability—the Functional Equivalence Domain of "Health & Physical Well-Being"*, 2009 WL 396030 at * 3 (S.S.A. Feb. 17, 2009) ("Impairments that affect health and physical well-being can have effects in other domains as well. For example, a child who must frequently miss school because of illness (including the need to go for treatment) may have social limitations that we also evaluate in the domain of "Interacting and relating with others," behavioral manifestations that we evaluate in the domain of "Caring for yourself," or both. In some cases, chronic absence from school may result in limitations we also evaluate in the domain of "Acquiring and using information.").

The regulations and Social Security Rulings also acknowledge the importance of school records and the need for an adjudicator to obtain such records in many cases. *See, e.g.*, 20 C.F.R. § 416.924a(a)(2)(iii) ("If you go to school, we will ask for information from your teachers and other school personnel about how

you are functioning there on a day-to-day basis compared to other children your age who do not have impairments."); 20 C.F.R. § 416.926a(b)(3) ("We will also ask for information from your parents and teachers, and may ask for information from others who see you often and can describe your functioning at home, in childcare, at school, and in your community."); 20 C.F.R. § 416.924a(b)(7)(i) ("[I]f you attend school (including preschool), the records of people who know you or who have examined you are important sources of information about your impairment(s) and its effects on your functioning.  Records from physicians, teachers and school psychologists, or physical, occupational, or speech-language therapists are examples of what we will consider.  If you receive early intervention services or go to school or preschool, we will consider this information when it is relevant and available to us."); 20 C.F.R. § 416.924a(b)(7)(ii) ("School evidence. If you go to school or preschool, we will ask your teacher(s) about your performance in your activities throughout your school day.  We will consider all the evidence we receive from your school, including teacher questionnaires, teacher checklists, group achievement testing, and report cards."); Soc. Sec. Ruling 09-2p, *Title XVI: Determining Childhood Disability—Documenting A Child's Impairment-Related Limitations*, 2009 WL 396032 at * 4 (S.S.A. Feb. 18, 2009) ("Non-Medical Sources: Evidence from other sources who are not medical sources and who know and have contact with the child can also be very important to our

15

understanding of the severity of a child's impairment(s) and how it affects day-to-day functioning.  These sources include parents and caregivers, educational personnel (for example, teachers, early intervention team members, counselors, developmental center workers, and daycare center workers), public and private social welfare agency personnel, and others (for example, siblings, friends, neighbors, and clergy).  Therefore, we will consider evidence from such non-medical sources when we determine the severity of the child's impairment(s) and how the child typically functions compared to children of the same age who do not have impairments."); *Id*. ("We require adjudicators to try to get EI [Early Intervention] and school records whenever they are needed to make a determination or decision regarding a child's disability.  We do not require information from EI or school personnel in every case because sometimes we can decide that a child is disabled without it, such as when the child's impairment(s) meets the requirements of a listing.  We may also have to make a determination or decision without EI or school evidence when we are unable to obtain it."); *Id*. at *11–12 (stating that "[a]djudicators should analyze and evaluate relevant evidence for consistency, and resolve any inconsistencies that need to be resolved," but noting that an inconsistency in the evidence "does not automatically mean that we need to request additional evidence, or that we cannot make a determination of decision" because an inconsistency may be immaterial or because the evidence in

16

the record "outweighs the inconsistent evidence and additional information would not change the determination or decision," and stating that "[i]n all other cases in which the evidence is insufficient, including when a material inconsistency exists that we cannot resolve based on an evaluation of all the relevant evidence in the case record, we will try to complete the record by requesting additional or clarifying information" (footnotes omitted)).

Despite the importance of evaluating K.N.M.R.'s functioning in all settings, including the educational setting, the record in this case does not contain any of K.N.M.R.'s school records.  Urena asserts that K.N.M.R. had trouble functioning at school. *See Admin. Tr.* at 53-54 (testifying that K.N.M.R. "misses around four or five days [of school] per month," that after K.N.M.R.'s surgery things improved for a while but then the problems came back, and that K.N.M.R.'s teachers have said that K.N.M.R. falls asleep at school); 84 (asserting that K.N.M.R. is falling asleep at school); 90 ("[K.N.M.R.]' medical problems, including kidney/bladder issues and falling asleep at school, prevent [K.N.M.R.] from functioning normally at school or home[.]"); 232 (asserting that K.N.M.R. is falling asleep at school); 243 (asserting that K.N.M.R. is falling asleep at school and not functioning normally at school); 272 (asserting that the record shows that K.N.M.R. "does not void or have bowel movements at school and has a urinary accident in mom's car when picked up," that K.N.M.R. "is less interactive at school . . . and teachers have

noticed this and told mom," and that K.N.M.R. is missing "school on average 4 days per month as well as falling asleep when at school and complaining of belly pain"). Although the ALJ acknowledged Urena's assertions regarding K.N.M.R.'s functioning, he did not fully credit them. *See Admin. Tr.* at 31 (concluding that Urena's "allegations concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record").

Further, the ALJ relied on a lack of corroborating evidence to discount Urena's assertions regarding how K.N.M.R. functioned in school in light of K.N.M.R.'s impairments. For example, in connection with his discussion of the domain of caring for oneself, the ALJ notes that K.N.M.R. "has been able to attend daycare and school," without a discussion of Urena's assertions and testimony regarding K.N.M.R. not toileting at school. *Id*. at 39. And in connection with his discussion of the domain of health and physical well-being, the ALJ notes that "Urena argues that [K.N.M.R.] misses four days of school per month and complains of constant abdominal pain as well as having urinary and bowel issues that cause" K.N.M.R. not to urinate or defecate in school but K.N.M.R. has urinary accidents after Urena picks K.N.M.R. up from school. *Id*. at 39. But then the ALJ appears to discount those assertions as not consistent with the other evidence in the

18

record. *Id*. at 39–40.  More pointedly, as to the domain of attending and completing

tasks, the ALJ discounted Urena's assertions because they were not corroborated:

> [K.N.M.R.] has less than marked limitation in attending and
> completing tasks.  While Ms. Rosario Urena alleges that
> [K.N.M.R.] has marked limitation in this area due to fatigue
> and sleeping during school prevents her from completing tasks
> and focusing, the undersigned notes that [K.N.M.R.] reportedly
> fell asleep two consecutive days in kindergarten.  Ms. Rosario
> Urena did not report to the providers that [K.N.M.R.] has been
> consistently sleeping at school despite feeling tired at times.  At
> the yearly wellness checks, Ms. Rosario Urena did not inform
> the pediatrician that [K.N.M.R.] had issues with sleeping during
> school.  Based on the aforementioned, the undersigned rejects
> the argument of Ms. Rosario Urena and finds [K.N.M.R.] has
> less than marked limitation in this area.  There is little evidence
> in the record of greater functional limitations in this area.  The
> opinions support the finding that limitation does not rise to the
> marked level.

*Admin. Tr.* at 35.

Urena contends that K.N.M.R.'s school records would shed light on how

K.N.M.R. functions in school, including how often K.N.M.R. misses school, how

often K.N.M.R. is off-task, and whether K.N.M.R. has urinary problems at school.

*Doc. 17* at 7, 12, 13; *Doc. 19* at 3.  And Urena asserts that the school records are

necessary because without them, "the ALJ cannot effectively evaluate [her]

statements." *Doc. 17* at 13.  Urena suggests that the school records would

corroborate her assertions, and if the ALJ fully accepted her testimony, he may

find that K.N.M.R. had a marked limitation in the domain of attending and

completing tasks, the domain of caring for oneself, or both, which would lead to a

finding of disability. *Id*.  Further, she suggests that if the ALJ fully accepted her testimony, he may find an extreme limitation in the domain of health and physical well-being, which would also lead to finding of disability. *Id*.

After considering the record and in light of the absence of the school records, the ALJ's discounting of some of Urena's assertions and testimony, and the fact that the school records would likely corroborate Urena's testimony, we conclude that the ALJ failed to develop the record.

The Commissioner contends that because Urena was represented by counsel at the hearing before the ALJ, and at the hearing, counsel stated that there were no additional records, the ALJ did not fail to develop the record. *Doc. 18* at 8–9.  The Commissioner relies on a line of cases that state that "'[w]hen an applicant for social security is represented by counsel the [ALJ] is entitled to assume that the applicant is making [her] strongest case for benefits.'" *Doc. 18* at 8 (quoting *Glenn v. Sec'y of Health & Hum. Servs.*, 814 F.2d 387, 391 (7th Cir. 1987), and *Myers v. Berryhill*, 373 F. Supp. 3d 528, 539 (M.D. Pa. 2019)).  Whatever merit such an argument may have in the case of a claimant who was represented by an attorney during the ALJ hearing we need not decide because here Urena was, in fact, not represented by an attorney at the ALJ hearing.  Rather, she had a non-attorney representative—Monte Mace—at the hearing. *See Admin. Tr.* at 28 (ALJ decision stating that Urena is represented by Monte Clark Mace, a non-attorney

representative), 75 (Claimant's-Appointment-of-a-Representative form on which Mace checked the box indicating that he is a non-attorney).[5]  And the Commissioner has not argued that the same assumption applies when a claimant is not represented by an attorney.

The Commissioner also contends that even if the ALJ erred by failing to develop the record, Urena has not shown that she was prejudiced by such error. Thus, according to the Commissioner, the error was harmless.

"Ordinary harmless error review, in which the appellant bears the burden to demonstrate harm, is applicable to administrative appeals." *Holloman v. Comm'r Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016).  Thus, a claimant must explain "'how the . . . error to which he points could have made any difference.'" *Id.* (quoting *Shinseki v. Sanders,* 556 U.S. 396, 413 (2009)).  "An error is 'harmless' when, despite the technical correctness of an appellant's legal contention, there is also 'no set of facts' upon which the appellant could recover." *Brown v. Astrue*, 649 F.3d 193, 195 (3d Cir. 2011).

---

[5] In addition to the Commissioner mistakenly asserting that Urena was represented by counsel at the administrative proceedings, *see doc. 18* at 8, Urena's current counsel also incorrectly asserts that Urena was represented by counsel at those proceedings, *see doc. 17* at 1.  We note that this misunderstanding may have been because the transcript of the hearing before the ALJ lists Mace as an attorney. *See id*. at 45.  But, as set forth above, Urena was represented by a non-attorney representative.

Here, as discussed above, the ALJ did not fully accept Urena's assertions and testimony regarding K.N.M.R.'s functioning, including in the school setting, and K.N.M.R.'s school records may corroborate her testimony in that regard. Accordingly, in the circumstances of this case, we cannot say that the ALJ's failure to develop the record was harmless.

## VI.  Remand is the appropriate remedy.

Because the ALJ erred by failing to develop the record and such error is not harmless, the question then is whether the court should remand the case to the Commissioner for further proceedings or award benefits to Urena.  We conclude that remand is the appropriate remedy.

Under sentence four of 42 U.S.C. § 405(g), the court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  Thus, although a remand is often the appropriate remedy, the court may also enter an order awarding the claimant benefits. *See Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 358 (3d Cir. 2008) (remanding the case to the district court with directions to enter an order awarding the payment of benefits); *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000) (same); *Podedworny v. Harris*, 745 F.2d 210, 223 (3d Cir. 1984) (same).  But an

"award [of] benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221–22.  Whether there has been excessive delay and/or prior remands also bears on whether to award benefits or to remand for further proceedings. *Diaz v. Berryhill*, 388 F. Supp. 3d 382, 391 (M.D. Pa. 2019).  "Thus, in practice any decision to award benefits in lieu of ordering a remand for further agency consideration entails the weighing of two factors: First, whether there has been an excessive delay in the litigation of the claim which is not attributable to the claimant; and second, whether the administrative record of the case has been fully developed and substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Id*.

Here, there has not been excessive delay in the litigation of Urena's claim, and we cannot say that substantial evidence on the record as a whole shows that K.N.M.R. is disabled and entitled to benefits.  Thus, we will remand the case to the Commissioner for further proceedings.

## VII. Conclusion.

For the foregoing reasons, we will vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).  An appropriate order follows.


*__S/Susan E. Schwab__*
Susan E. Schwab
United States Magistrate Judge